No. 3-02-0754

_________________________________________________________________

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2004

THE PEOPLE OF THE STATE OF     ) Appeal from the Circuit Court

ILLINOIS,   ) for the 10th
 Judicial Circuit,

   ) Peoria County, Illinois

Plaintiff-Appellee,   )                       

   ) 

   ) No. 02-CF-28

   )

ANDREW LAMON,   ) Honorable Thomas G. Ebel

   ) Judge, Presiding

Defendant-Appellant.   )

_________________________________________________________________

JUSTICE McDADE delivered the opinion of the court:

_________________________________________________________________

Following a jury trial, defendant Andrew Lamon was convicted of aggravated criminal sexual assault (720 ILCS 5/12-14(a)(2) (West 2002
)) and unlawful possession of a controlled substance with intent to deliver. 
720 ILCS 570/401 (West 2002). 
He was sentenced to an extended term of 30 years’ imprisonment for the aggravated criminal sexual assault conviction and a term of 5 years on the unlawful possession offense, sentences to run concurrently. Defendant does not challenge his drug conviction but raises three issues on appeal relating to his sexual assault conviction: (1) 
whether the evidence adduced at trial was sufficient to prove his guilt beyond a reasonable doubt; (2) 
whether he was denied a fair trial because 
the jury had been improperly influenced by an allegedly prejudicial newspaper article
; and (3) whether he was denied his right to a fair trial by the State’s alleged knowing use of the victim’s allegedly perjured testimony. We affirm. 

FACTS

The victim, testified for the State that 
she and defendant had been in a long-term intimate relationship which had ended in September of 2001. 
On January 6, 2002, the night in question,
 defendant paid a "surprise" visit to her residence at about 5 p.m. 
She testified that she and her children finished dinner at 6:30 p.m. and then she went upstairs to her bedroom where defendant had been waiting. 

She testified that once upstairs, defendant grabbed her by her hair 
and called her a "whore." He accused her of "cheating" and demanded to know the identity of her lover. Defendant then placed her daughter in another room and closed the bedroom door. The victim further testified that defendant forced her to lie on her back on the bedroom floor where he stood over her and urinated on her. Next, he told her to take her clothes off. She complied.
 Defendant subsequently tied her wrists with an electrical cord, placed a sock in her mouth, and taped her mouth shut. Defendant told her: "You better not scream and make the kids come to the door." If the victim did not comply, she "would not live to see the next day." A beating ensued in which defendant struck the victim several times with a wire coat hanger. She testified that after the beating, she was forced to perform oral sex on defendant. Defendant also raped her anally until he ejaculated. She stated that shortly after the assault, "[defendant] laid down. Then he got back up and he untied me, and he told me to lay in the bed and not to move."  According to the victim, the whole incident only lasted 20 minutes. 

The victim recounted that she remained in bed with defendant for approximately four hours. While defendant was sound asleep, she drove to a Peoria police station where she was interviewed by several police officers.

She talked to Officer Katherine Baer while she was at the police station. Baer observed the victim in an agitated state, with a cut above her eye and bruises on her wrist.
 Officer Brad Hutchinson was present at the interview. He also testified at the trial. He noticed that the victim looked very upset. 
He opined that the injuries on her wrists were consistent with "being tied up."
 The pictures of the victim taken soon after the incident also show bruised areas around her breast 
and right shoulder. 

 After the preliminary interview, Officers Baer and Buchanan and the victim all returned to the house to investigate her allegations. Upon arriving at the residence, the officers went to the upper floor and found defendant sitting in his bed. The officers searched the bedroom and found items similar to those described by the victim as having been in the room in which the attack occurred. 

Officer Buchanan testified that he arrested defendant and took him to a police vehicle.
 At that moment, defendant told him: "That bitch is selling heroin and she has some in my coat right now."  
Defendant then described a dark trench coat inside the victim’s closet. After securing defendant inside the vehicle, Buchanan and other officers reentered the bedroom and checked the coat. Upon searching the pockets of the coat, Buchanan discovered heroin. 

Officer Richard Ledbetter testified that he spoke with defendant at the police station in the early morning hours of January 7, 2002. Defendant told him that he understood his rights and then related to Officer Ledbetter his version of the events. 

He admitted that he had lost his temper and had hit the victim during an argument. 
Officer Ledbetter asked defendant if the sex was consensual and was told by defendant, "[s]he liked her sex rough and she did not resist being tied up."

The victim was taken to an emergency room later that morning. Sally Gniepentrog, an emergency room nurse, testified that she treated the woman in the emergency room on the morning of January 7.  The victim told her that she had been raped.
 Gniepentrog gathered evidence for a sexual assault kit. According to Gniepentrog, defendant’s sperm was found on an anal swab taken from the victim.  She also had bruising to her body, including around her left breast and on her right wrist.

On January 19, 2002, in a notarized letter to the prosecutor, the victim recanted the allegations against defendant and instead claimed the sex was consensual. In the letter, she explained that she made up the story because "[w]e had an argument *** and things got out of hand."  Her letter concluded that "[t]he things that I said and written about in my statement was done in an angry state."  In her direct testimony, the victim explained: "I had typed [the recantation letter], because [defendant] took $700.00 from me and he said he’d give me my money back."

The State presented additional testimony on this subject. 
According to Mr. Michael Hirsh, an investigator for the Peoria County State’s Attorney’s office, the victim wrote the letter of recantation due to continued pressure from defendant. She told Hirsh that defendant continued to call her from jail in order to force a recantation letter to be written, and that "she would do just about anything to have [those] phone calls stopped."

On cross-examination, the victim stated that the sexual assault lasted approximately an hour. She admitted that during her initial interview with the police, she did not say that defendant had sexually assaulted her or raped her.
 She told Officer Baer that she had been sexually assaulted only 
after the police had discovered heroin in defendant’s trench coat.  She
 
further testified that her recantation resulted from pressure exerted on her by defendant and his brother-in-law.

Defendant testified on his own behalf and he told a story that was different in significant ways from the victim’s. He first stated that the victim was his common law wife. Two children were born to this "marriage."  Defendant also related to the jury that he "had cheated on [the victim] with Felicia Smith," a heroin addict. He further claimed that the victim and her cousin "beat Smith with a bat." He admitted that his relationship with the victim was "really shaky," but they "were basically trying to reconcile and get it stricken [sic] back to where it was." Defendant’s testimony substantially corroborated the nature of his physical attack on the victim. He denied, however, that the attack occurred 
before
 the sexual assault. 
Defendant testified that he had sex with her on the night in question, but it was consensual--he did not rape her. Defendant insisted he and the victim fell asleep after sex and got into an argument about her infidelities after they awoke. He then admitted the following:

"I hit [her], I urinated on [her], and I hit her with the clothes hanger, put a sock in her mouth, put tape around her mouth. I asked [her] about the relationship that she was having. She just wouldn’t tell me. That was more pertinent than anything on this earth for me, not because of some jealousy as it was portrayed here, it’s a hell of a lot more than that."

During the trial--on the day before closing arguments--an article appeared on the local state page of the Peoria
 Journal Star 
which reported:

"Lamon, who also testified Wednesday, never denied beating or urinating on the woman. At issue is whether Lamon raped her. He claims the two had consensual sex before the beatings. The woman testified Lamon raped her. 

It matters because Lamon isn’t charged in connection with the beating. Instead, he faces the charge of aggravated criminal sexual assault or, in layman’s terms, rape.

Prosecutors must prove the beating and the sex occurred roughly the same time in order to get a conviction on the sexual assault charge."  (Andy Kravetz, 
Peoria Woman, Age 30, Testifies In Sexual Assault Trial
, 
PEORIA J. STAR, July 11, 2002, at B2.)

Defendant alleged that several jurors had been exposed to this article and asked the court to question the jury. On interrogation two jurors admitted reading the article. Juror Mangers informed the court that he had read the article but that nothing in it would influence his decision. The second juror who admitted to seeing the article also assured the court that he would not allow it to influence his decision. The judge asked no follow-up questions of any of the jurors, nor did he read the article before allowing the trial to proceed. 

During closing arguments, defense counsel asserted that the evidence of drug possession established the victim’s motive to fabricate the sexual assault story, characterizing it as a preemptive move to avoid impending drug and assault charges. He also argued that the evidence was sufficient to establish that the victim’s jealousy of defendant’s relationship with his lover motivated the victim to claim that sex with him had been forced. Defense counsel sought to buttress these assertions by restating that the victim had engaged in behavior seemingly inconsistent with a sexual assault, such as her initial reluctance in reporting 
the crime. The jury rejected these theories and found defendant guilty of aggravated criminal sexual assault. 
Defendant filed his timely appeal.  

ANALYSIS

I. Reasonable Doubt

In his first assignment of error, defendant claims the evidence was insufficient to support the verdict rendered by the jury. Specifically, defendant claims inconsistencies in the victim’s testimony negated her credibility. We disagree. 

When considering a challenge to the sufficiency of the evidence, it is not the function of this court to retry the defendant. 
People v. Collins
, 106 Ill. 2d 237, 478 N.E.2d 267 (1985). The trier of fact was responsible for determining the witnesses' credibility, weighing their testimony, and drawing reasonable inferences from the evidence. 
People v. Bailey
, 311 Ill. App. 3d 265, 724 N.E.2d 1032 (2000). We may not substitute our judgment for that of the trier of fact on questions involving evidentiary weight, witness credibility, or resolution of conflicting testimony. 
People v. Campbell
, 146 Ill. 2d 363, 586 N.E.2d 1261 (1992). The relevant question on review is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the elements of the crime proven beyond a reasonable doubt. 
Collins
, 106 Ill. 2d 237, 478 N.E.2d 267. 
We will reverse the defendant's convictions only if the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of his guilt. 
People v. Brackett
, 288 Ill. App. 3d 12, 679 N.E.2d 1285 (1997).

The aggravated criminal sexual assault statute, under which the defendant was found guilty, provides:

"(a) [t]he accused commits aggravated criminal sexual assault if he or she commits criminal sexual assault and any of the following aggravating circumstances existed during *** the commission of the offense:

* * *

(2) the accused caused bodily harm *** to the victim." 720 ILCS 5/12-14(a)(2) (West 2002). 

A defendant commits criminal sexual assault if he or she "commits an act of sexual penetration by the use of force or threat of force." 720 ILCS 5/12-13(a)(1) (West 2002). Bodily harm may be shown by the actual injury, such as bruises, or may be inferred by the trier of fact based upon common knowledge. 
People v. Lopez
, 222 Ill. App. 3d 872, 584 N.E.2d 462 (1991). 

In the instant case, the evidence as a whole, viewed in the light most favorable to the prosecution, sufficiently described defendant's conduct during the commission of the offense. 
 The victim remembered the events of the evening and the incident in both a chronological order and a coherent manner.
 Her testimony revealed that defendant first bound her wrists with an electrical cord. He also taped her mouth shut and told her not to scream. She was then beaten with a wire coat hanger. As a result of the beating, she suffered multiple bruises on her wrists and cuts on face and breasts. 
Finally, defendant forced her to orally copulate him, and eventually raped her anally.

Although there were no independent eyewitnesses to the events that night, the victim’s testimony was sufficiently corroborated by witnesses to subsequent actions and by physical evidence. Several police officers noticed bruises on her body. They related that she was very upset and seemed to have been crying. Medical testimony also established that she had fresh bruises on her breast and wrist and a scratch mark on her neck. Although each of these injuries can occur during consensual intercourse, the constellation of the injuries is consistent with her claim that the sex that morning or previous evening was not consensual.

Defendant maintains that the victim’s trial testimony was "more fantasy than fact." He asserts that there were numerous flaws and inconsistencies in her testimony concerning the time and sequence of the events in question. One such inconsistency defendant relies upon is her testimony that her emergency room examination took 20 minutes. Defendant points out that the attending nurse testified the examination lasted two hours. He reasons: "If [the victim] could not even recall how long it took for the examination, what could the jury possibly believe of the rest of her testimony?"  The victim also testified on direct examination that the sexual assault lasted approximately 20 minutes, yet her subsequent testimony on cross-examination revealed that the whole incident lasted about an hour. 
Defendant further claims that the fact that she remained in bed with him for more than four hours before reporting the incident to the police casts serious doubt on her credibility. 

Undoubtedly, these inconsistencies and "flaws" affected the victim’s credibility.
 They were, however, presented in the presence of the jury and could be weighed by the jurors in evaluating the relative credibility of the participants. 
We believe these inconsistencies, which were brought out in defendant's cross-examination of the victim, were relatively minor and bore only upon the weight to be afforded her testimony. They do not call into question the identity of the attacker or whether she was in fact brutally beaten. While the recantation letter and the victim’s later repudiation of it bear on the issue of whether there was a sexual assault at all, the evidence that she could not remember the exact duration of the assault or the length of her medical examination simply does not add, on the facts of this case,
 anything to the question of whether defendant forced her to have sexual intercourse with him as alleged.
 Therefore, we do not find that these inconsistencies so detract from the victim’s testimony that the jury could not find her credible on the critical issues or that reversal of defendant’s conviction would be required.

Defendant next suggests that the victim falsely accused him of sexually assaulting her to avoid drug and assault charges. 

As in many sex offense cases, the outcome here rested primarily upon the credibility of the victim and the defendant. By finding defendant guilty, the jury presumably was satisfied that the victim was a credible witness and deserving of belief. The jurors were not only able to listen to her live presentation, but they were also able to observe her manner and demeanor while testifying. Evidence of the alleged drug-related motive was before the jury when she and defendant testified, but the jury chose to believe her version over the testimony given by defendant.  We do not find that choice to be improbable or unreasonable.

Defendant alternatively argues that aggravated criminal sexual assault was not proved because the victim’s testimony could not establish beyond a reasonable doubt that her physical injuries, which make a sexual assault an aggravated sexual assault, occurred during the sexual assault and not after. He claims in order for him to be convicted of aggravated criminal sexual assault, the State must prove that bodily harm was contemporaneous to the criminal sexual assault. 
People v. Potts
, 224 Ill. App. 3d 938, 586 N.E.2d 1376 (1992). 

This court considered the same argument in 
People v. Colley
, 188 Ill. App. 3d 817, 544 N.E.2d 812 (1989), in which we affirmed a conviction of aggravated criminal sexual assault. In 
Colley
, the defendant cut the victim’s neck and chin with a pocketknife soon after completion of the sexual assault. On appeal, he maintained that he could not be convicted of aggravated criminal sexual assault because the stabbing occurred too long after the sexual assault to be considered part of the same course of conduct. In rejecting the defendant’s argument, this court found that "the stab wounds occurred sufficiently close in time to the sexual acts that they can be said to have been committed during the course of the sexual assault." 
Colley
, 188 Ill. App. 3d 
at 820. 
This court also refused to "draw a bright line between the ending of the sexual acts and the bodily harm occurring afterward, as that would defeat the statutory purpose of protecting victims from sex offenders."  
Colley
, 188 Ill. App. 3d 
at 820. 

Similarly, in this case, we will not draw a bright line that would require the State to establish the precise sequence of events in order to prove the aggravated sexual assault upon the victim. What is significant is not the order in which the forced intercourse and assault occurred, but that defendant sexually assaulted the victim and the infliction of the bodily injury occurred during or as a part of the commission of that forcible rape.
 
During his trial, defendant had already argued that he and the victim had consensual sex and that he hit her a substantial time after the sex. The jury chose to believe the testimony of the State’s witnesses was more credible than that of defendant. In light of the narrow scope of review we are compelled to apply, we must conclude that a rational trier of fact could have found defendant guilty.

II. Prejudicial Newspaper Article

Defendant further asserts that he was denied a fair trial because the jury was improperly influenced by a prejudicial newspaper article.
 In addition, he claims that the trial court failed to thoroughly examine the jurors regarding possible prejudice. 

The State argues that this issue is waived because defendant failed to object to the court’s inquiry at trial. Defendant maintains, however, that the plain error rule applies because the evidence was closely balanced, citing Supreme Court Rule 615(a) in support of his contention. 134 Ill.2d R. 615(a).

Ordinarily, a defendant must object to an error at trial and include the objection in a posttrial motion in order to preserve the issue for review on appeal. 
People v. Enoch
, 122 Ill. 2d 176, 186, 522 N.E.2d 1124 (1988). The plain error rule may be invoked in criminal cases when a defendant has not properly preserved an error for review, where the evidence is closely balanced, or where the error adversely affected the defendant's right to a fair trial. 
People v. Carlson
, 79 Ill. 2d 564, 404 N.E.2d 233 (1980). 

Here, the evidence can reasonably be considered closely balanced. Although there was physical evidence linking defendant to a sex act and to a beating, his conviction rested primarily on a determination that the two acts were roughly contemporaneous--a determination that rested almost entirely on the perceived credibility of the defendant and the victim. Because we find the evidence to be closely balanced, we will address the issue of allegedly prejudicial publicity during trial on its merits. 

"A fair trial requires the participation of impartial jurors." 
People v. Rogers
, 135 Ill. App. 3d 608, 625, 482 N.E.2d 639 (1985); citing 
People v. Jones
, 105 Ill. 2d 342, 475 N.E.2d 832 (1985). 
In Illinois, not every situation in which extraneous or unauthorized information reaches the jury results in prejudicial error. 
People v. Collins
, 71 Ill. App. 3d 815, 390 N.E.2d 463 (1979). 
When a defendant alleges that he or she was denied a fair trial by virtue of a newspaper article, the defendant must prove that: (1) the newspaper article was prejudicial, (2) a juror was exposed to the prejudicial article, and (3) the juror’s decision was influenced by the article. 
People v. Malmenato
, 14 Ill. 2d 52, 150 N.E.2d 806 (1958). 

Generally, the determination of whether extraneous material received by a juror during the course of the trial is prejudicial is to be made by the trial court. 
Rogers
, 135 Ill. App. 3d 
at 625 
("If it is alleged that the jury has been improperly influenced by allegedly prejudicial materials like a newspaper article, the trial court must determine whether such material prejudiced the defendant").  
The determination rests within the sound discretion of the trial court. 
Rogers
, 135 Ill. App. 3d 
at 625. In exercising that discretion, a trial judge should not only rely on what the jurors say on interrogation, but also upon the nature of the publicity, its content and its potential for prejudice. 
People v. Barrow
, 133 Ill. 2d 226, 549 N.E.2d 240 (1989). 
The court’s determination will not be set aside absent an abuse of that discretion. 
Rogers
, 135 Ill. App. 3d
 at 625, citing 
People v. Hryciuk
, 5 Ill. 2d 176, 125 N.E.2d 61 (1954). 

It was improper for the court not to admonish the jury to avoid exposure to publicity about the trial; it was improper for the jurors to read the article; and it was improper for the court to reach its decision without even reviewing the article in question.  We believe that the trial court, when faced with the fact that some of the jurors had read an article bearing directly on the trial, erred procedurally in failing to properly assess and support its determination that the article was not prejudicial. The court apparently relied solely on the jurors’ assurances that the article would not influence their judgment.  Defendant also argues that those assurances should not have been conclusive.  We agree.

Nonetheless, in our opinion, defendant has failed to show prejudice and the error of the trial court is harmless. See 134 Ill.2d R. 615 (a) ("Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded"). In considering defendant’s posttrial motion for reconsideration, the trial court belatedly but correctly determined that the article in question contained only information of which the jurors were already aware through trial evidence and testimony.  The article stated, also correctly, that defendant was charged with aggravated sexual assault and that the State "must prove the beating and sex occurred roughly the same time in order to get a conviction on the sexual assault charge."  (Andy Kravetz, 
Peoria Woman, Age 30, Testifies In Sexual Assault Trial
, PEORIA J. STAR, 
July 11, 2002, at B2.)

Because we believe that the absence of prejudicial content of the article rendered the trial court’s decision to move forward with the trial without dismissing the affected jurors harmless, we do not reach defendant’s challenge to the court’s reliance on the personal assurances of those jurors. 

III. Victim’s Perjured Testimony

Finally, defendant argues that the victim’s testimony explaining her reasons for writing the recantation letter constitutes perjury, and therefore he was denied a fair trial. The State counters that it did not use perjured testimony, and the perjury allegation is not supported by the record. Any discrepancy between the victim’s direct examination testimony and her testimony on cross-examination was merely an inconsistency. 

It is well established that the State’s knowing use of perjured testimony to obtain a criminal conviction violates due process of law. 
People v. Olinger
, 176 Ill. 2d 326, 680 N.E.2d 321 (1997). A conviction obtained through the knowing use of perjured testimony must be set aside. 
Olinger
, 176 Ill. 2d at 345. Where the State allows false testimony to go uncorrected, the same principles apply. 
Olinger
, 176 Ill. 2d at 345.

Our supreme court has held that in such cases, a ‘"strict standard of materiality’" applies, and the reviewing court must overturn the conviction "‘if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.’" 
People v. Lucas
, 203 Ill. 2d 410, 787 N.E.2d 113 (2002), citing 
People v. Coleman
, 183 Ill. 2d 366, 392, 701 N.E.2d 1063 (1998). "This standard is equivalent to the harmless error standards ***." 
Olinger
, 176 Ill. 2d at 349. 

We agree with the State that defendant’s allegations are conclusory. There is no proof that the victim lied at the trial, only that there were some inconsistencies between her direct testimony and that elicited during crossexamination. The mere fact of inconsistency does not constitute proof that the direct testimony she gave at the trial was false. 
People v. Amos
, 204 Ill. App. 3d 75, 85, 561 N.E.2d 1347 (1990). Much less does it support the charge that the prosecutor knew of perjured testimony but nevertheless willfully and intentionally used it.

We also find that the notarized recantation letter is material only to the extent that it reflects that the victim had changed her story, but this fact does not undermine the credibility of her trial testimony repudiating the letter. In fact, the victim’s retraction fits the classic pattern of the recanting witness in a sex case. The victim and Hirsh both testified that her recantation resulted from pressure exerted on her by defendant and his brother-in-law. Despite numerous inconsistencies in her trial testimony, she did not recant the essence of her allegation, that defendant sexually assaulted her.  

CONCLUSION

For the reasons stated, we affirm defendant's conviction and the sentence imposed.

SLATER and BARRY, JJ., concur.